IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| WOLFE ELECTRIC COMPANY, INC., a Nebraska Corporation;<br><br>Plaintiff,<br><br>vs.<br><br>CORPORATE BUSINESS SOLUTIONS, INC., an Illinois Corporation;  GPS, USA, INC., a Nevada Corporation; and STRATEGIC TAX ADVISORS, INC., a Nevada Corporation;<br><br>Defendants. | 4:13CV3040<br><br>MEMORANDUM AND ORDER |

This matter is before the court on the Defendants' Motion to Compel Arbitration and to Dismiss or, Alternatively, Stay Proceedings, (Filing No. 11).  For the reasons set forth below the motion is granted in part and denied in part.

BACKGROUND

Wolfe Electric Company, Inc. ("Wolfe Electric") is a Nebraska corporation with its principal place of business in Lincoln, Nebraska.  Defendants Corporate Business Solutions, Inc. ("CBS"); GPS, USA, Inc. ("GPS"); and Strategic Tax Advisors, Inc. ("STA") provide various business consulting services.  CBS is an Illinois corporation doing business in Nebraska.  GPS and STA are Nevada corporations doing business in Nebraska.

Wolfe Electric alleges Defendants contacted its president, Richard Wolfe ("Wolfe"), regarding the potential of Defendants providing various business consulting services to Wolfe Electric. (Filing No. 32, ¶5, at CM/ECF p. 2).  Specifically, Plaintiff alleges Wolfe met with a representative of GPS, Kathy Nielson, on March 1, 2011, that

Nielson was meeting with Wolfe on behalf of and with the consent of GPS and CBS, and that CBS would provide a business analysis service to Wolfe Electric. (Filing No. 32, ¶6, at CM/ECF p. 2). Plaintiff further alleges Nielson represented "CBS and its related companies, GPS and STA, would provide specific results to Wolfe Electric" including an increase in its profit margin sufficient to cover the cost of the proposed consulting services. (Filing No. 32, ¶¶6-7 at CM/ECF p. 2).[1]

Wolfe Electric shared its confidential financial information with a Senior Business Analyst from CBS who, upon review of that information, allegedly represented on March 14, 2011, that Wolfe Electric was "in a critical financial state." (Filing No. 32, ¶15, at CM/ECF p. 4). That same day, a Senior Tax Consultant for STA met with a representative from Wolfe Electric and "represented that STA would provide tax-related services to Wolfe Electric in conjunction with the services provided by CBS and GPS." (Filing No. 32, ¶18, at CM/ECF p. 4).

The parties apparently agreed upon the provision of consulting services and memorialized the agreements by entering into a "Consulting Agreement" and a "U.S. Agreement for Tax Consulting Services" (the "Tax Consulting Agreement") on March 14, 2011. (Filing No. 12-1).

The Consulting Agreement, (Filing No. 12-1), between Wolfe Electric and CBS was "for the sole purpose of CBS providing consulting services" to Wolfe Electric. The Consulting Agreement sets for the terms of engagement including, as indicated on the second page of the two page agreement, the following paragraph,

---

[1] This case was originally filed in the District Court of Lancaster County, Nebraska on January 17, 2013 and was removed to this court on February 25, 2013. (Filing No. 1).

### Other Agreements

> It is expressly agreed that his printed document embodies the entire agreement of the parties in relation to the subject matter of consulting services to be rendered by CBS; and that no other understanding or agreement, verbal or otherwise, exists between the parties, except as herein expressly set forth. **Client and CBS expressly agree all disputes of any kind between the parties arising out of or in connection with this Agreement shall be submitted to binding arbitration which would be administered by the American Arbitration Association.** Exclusive jurisdiction and venue shall vest in Lake County, Illinois, Illinois law applying.

(Filing No. 12-1, at CM/ECF p. 4) (emphasis in original).

Wolfe Electric and STA entered into the Tax Consulting Agreement "for the sole purpose of [Wolfe Electric] retaining STA to provide consulting services." (Filing No. 12-1, at CM/ECF p. 5). The Tax Consulting Agreement further provided that STA would "evaluate [Wolfe Electric's] past years tax reporting submissions and develop future savings and asset protection strategies." Id. The second page of this two page agreement contains an arbitration provision, identical to one contained in the above cited Consulting Agreement, requiring the arbitration of any dispute arising out of the Tax Consulting Agreement between Wolfe Electric and STA. (Filing No. 12-1, at CM/ECF p. 6). Wolfe signed both the Consulting Agreement and the Tax Consulting Agreement in his capacity as president of Wolfe Electric on March 11, 2011.[2]

---

[2] Plaintiff infers, without expressly stating, that the respective agreements might not be valid and that it "cannot confirm or deny the authenticity of the document purporting to contain an arbitration clause between Wolfe Electric and . . . STA." Filing No. 20, at CM/ECF p. 15. However, Wolfe Electric also acknowledges the signature of Richard Wolfe appears on the agreement between STA and Wolfe Electric and states it is "quite possible" Wolfe did sign the document as represented. Filing No. 20, n. 1, at CM/ECF p. 15. Without some evidence of how Wolfe's signature could appear on the document without him actually signing it, the court will presume Wolfe signed the Tax Consulting Agreement and will not further address Wolfe Electric's inferences to the contrary.

Wolfe Electric alleges the defendants made several fraudulent misrepresentations to Wolfe while attempting to secure contracts for consulting services including,

    a.    Wolfe Electric was in a critical financial state,

    b.    Defendants would provide specific results to Wolfe Electric, including a guaranteed 3-5% increase in profit margins plus increased profits during the first year sufficient to cover the cost of consulting services provided by Defendants;

    c.    Defendants had insurance coverage in force for the protection of Wolfe Electric in the amount of $2,000,000;

    d.    Defendants had experts in Wolfe Electric's industry who would provide all consulting services to Wolfe Electric on behalf of Defendants;

    e.    Defendants would provide services and products to Wolfe Electric that were necessary to fix Wolfe Electric's financial condition.

(Filing No. 20, at CM/ECF p. 4).

The parties' relationship deteriorated and Wolfe Electric filed suit alleging Defendants did not provide the services or results they represented they would. Defendants now seek to compel arbitration pursuant to the provisions in the Consulting Agreement and the Tax Consulting Agreement and to have this case dismissed, or in the alternative, stayed pending the completion of arbitration.

## ANALYSIS

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." AT & T Technologies v. Communications Workers of Am., 475 U.S. 643, 648 (1986); see also Churchill

Environmental and Indus. Equity Partners, L.P. v Ernst & Young, L.L.P., 643 N.W.2d 333, 336 (Minn. Ct. App. 2002)(citing AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA, 242 F.3d 780, 782 (8th Cir. 2001)). Unless the parties have agreed to submit the arbitrability question itself to arbitration, the court must first decide whether a valid agreement to arbitrate exists. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). If so, the court must then determine if the parties' dispute falls within the scope of the arbitration agreement. AT & T Technologies, 475 U.S. at 649; Lipton-U.City, LLC v. Shurgard Storage Centers, Inc., 454 F.3d 934, 937 (8th Cir. 2006); Teamsters Local Union No. 688 v. Industrial Wire Products, Inc., 186 F.3d 878, 881 (8th Cir. 1999). "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes--but only those disputes--that the parties have agreed to submit to arbitration." First Options, 514 U.S. at 943 (1995).

Except to the extent state law treats arbitration agreements differently from other contracts, ordinary state-law principles govern the determination of whether an arbitration contract was formed. First Options, 514 U.S. at 944. However, once the court determines that an arbitration agreement exists, the Federal Arbitration Act, as a matter of federal law, requires that any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration. Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983); Teamsters Local Union No. 688, 186 F.3d at 881)("[A]rbitration is a matter of contract and may not be ordered unless the parties agreed to submit the dispute to arbitration. . . . [W]hen an arbitration clause exists in a contract, there is a presumption of arbitrability unless it is clear that the arbitration clause is not susceptible of an interpretation that covers the dispute."). Specifically, the presumption of arbitrability applies to the scope of an arbitration agreement, but not to the existence of such an agreement. See Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998).

5

I.  Arbitration as to CBS and STA.

The Consulting Agreement and Tax Consulting Agreements each contain an express provision requiring the parties to arbitrate disputes of any kind resulting from the respective agreements. CBS and STA seek to enforce these provisions while Wolfe Electric requests that the court refuse to order arbitration. Each of Wolfe Electric's arguments against compelling arbitration are addressed in turn.

A.  Fraud.

Plaintiff argues the court should not compel arbitration of the disputes between it and CBS and STA, alleging the Consulting Agreement and Tax Consulting Agreement were procured by fraud and are unconscionable. It is well settled law that "a party's challenge . . . to the contract as a whole does not prevent the court from enforcing a specific agreement to arbitrate." Rent-A-Center, West, Inc. v. Jackson, -- U.S. --, 130 S.Ct. 2772, 2778 (2010). Even "where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of the contract – [the Court] nonetheless require[s] the basis of the challenge to be directed specifically to the agreement to arbitrate before the court will intervene." Id.

All of the alleged instances of fraud of which Plaintiff complains relate to the general contract negotiations and the performance of the contract and do not speak to the arbitration provision specifically. For instance, Plaintiff argues it was induced to enter the agreement because Defendants allegedly misrepresented Plaintiff's financial condition and Defendants' competency and ability to deliver on its promises to increase Wolfe Electric's profit margins. None of these complaints specifically apply to the arbitration provisions in each contract. Without accusations of fraud pertaining

6

specifically to the arbitration provisions in the respective contracts, the court will not intervene. Rent-A-Center, 130 S.Ct. at 2779; M.A. Mortenson Co. v. Sanders Concrete Co., Inc., 676 F.3d 1153, 1157 (8th Cir. 2012); see also Ikechi v. Verizon Wireless, case no. 10cv4554, 2012 WL 3079254, (D. Minn. July 6, 2012) (parties will be forced to abide by an arbitration clause where claims of fraud are not directed specifically to the arbitration clause).

    B.    Unconscionability.

Plaintiff also argues the arbitration provisions are unconscionable and, for that reason, should not be enforced. "[W]hen deciding whether an arbitration provision is unconscionable, courts apply ordinary state-law principles governing the formation of contracts." Pro Tech Industries, Inc. v. URS Corp., 377 F.3d 868, 872 (8th Cir. 2004). The parties appear to agree that Nebraska law applies in this case.

> The unconscionability of a contract provision presents a question of law. See Melcher v. Boesch Motor Co., 188 Neb. 522, 198 N.W.2d 57 (1972). When considering whether an agreement is unconscionable, this court has stated that the term "unconscionable" means manifestly unfair or inequitable. See Weber v. Weber, 200 Neb. 659, 265 N.W.2d 436 (1978). A contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed when the parties entered into the contract. Adams v. American Cyanamid Co., 1 Neb.App. 337, 498 N.W.2d 577 (1992). In a commercial setting, however, substantive unconscionability alone is usually insufficient to void a contract or clause. See id., citing 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28 (2d ed. 1990). A court must also consider whether the contract formation was procedurally unconscionable. See id. An essential fact in determining unconscionability is the disparity in respective bargaining positions of parties to a contract. See Ray Tucker & Sons v. GTE Directories Sales Corp., 253 Neb. 458, 571 N.W.2d 64 (1997).

Myers v. Nebraska Inv. Council, 272 Neb. 669, 692-93, 724 N.W.2d 776, 799 (2006). The court may also consider the manner in which the parties entered the contract, whether the parties had reasonable opportunity to understand the terms of the contract; and whether the important terms of the contract were hidden in the fine print. Parizek v. Roncalli Catholic High School, 11 Neb. App. 482, 655 N.W.2d 404, 408 (2002).

Wolfe Electric alleges the arbitration clause is unconscionable, but in support of its claim, it mostly reasserts the fraud arguments addressed above. Wolfe Electric also claims the arbitration clauses were "hidden" within the agreements and that Wolfe was "overwhelm[ed]" by the paper work and the "sudden physical presence of various representatives of the three Defendant corporations". (Filing No. 20, at CM/ECF p. 11). The Amended Complaint further asserts that Wolfe Electric did not have an opportunity to "review the arbitration clause prior to signing the documents," that Defendants did not inform Plaintiff of the presence of arbitration clauses, and that "Defendants preyed upon Wolfe Electric's financial vulnerability." (Filing No. 32, ¶¶ 36-7, at CM/ECF p. 8). These arguments are not persuasive.

Defendants provided unrefuted evidence that Wolfe Electric is a well-established business with extensive dealings with contracts and litigation. (Filing No. 26). There is no evidence that Wolfe Electric was somehow forced to accept the Defendants' offer of consulting services or that the company could not have explored other alternatives to working with Defendants. Further, Plaintiff has provided no evidence to support its claim that an imbalance of bargaining power existed between these businesses.

Plaintiff's assertion that the arbitration clause was "hidden" in the documents is also without merit. The Consulting Agreement and Tax Consulting Agreement are each two pages in length. The arbitration provision is in bold in the final paragraph of the

documents, on the same page where Wolfe signed as president of the Wolfe Electric. Plaintiff's argument that it could not have read the two page contracts and discovered the arbitration clause is unavailing.

Finally, Plaintiff argues that the arbitration clause is unconscionable because the costs associated with arbitrating the case in Illinois[3] "shocks the conscious." (Filing No. 20, at CM/ECF p. 13). Plaintiff offers evidence that it "may well" have to pay a $4,050 administrative filing fee plus the arbitrator's fee of $300 to $350 an hour. (Filing No. 20, at CM/ECF p. 13). Even assuming Plaintiff will have to pay these costs, the expenses of arbitration do not approach a level which "shocks the conscious." And Plaintiff's argument ignores that whether resolved by arbitration or litigation, this case will cost money. There is no evidence the projected arbitration costs will exceed the likely litigation costs. See generally E.E.O.C. v. Woodmen of World Life Ins. Soc., 479 F.3d 561, 567 (8th Cir. 2007)("[T]he fact that a party will incur litigation costs and attorney's fees in an arbitral forum does not make that forum unconscionable, she would generally face those fees regardless of forum.").

Further, Plaintiff has not asserted that it will be unable to afford the costs of arbitration, making this case easily distinguishable from cases where the courts have found arbitration agreements unconscionable due to cost. See Faber v. Menard, Inc., 367 F.3d 1048, 1054 (8th Cir. 2004)("party seeking to avoid arbitration should present specific evidence of likely arbitrators' fees and its financial ability to pay"); Sprague v. Household Intern., 473 F. Supp. 2d 966, 976 (W.D. Mo. 2005)(Plaintiff submitted an uncontested "affidavit of poverty" in support of its contention it could not pay for arbitration). Plaintiff has failed to show that the costs of arbitration rise to the level of

---

[3] Defendants have agreed to arbitrate the dispute in Nebraska if Plaintiff so desires. (Filing No. 27-1, ¶3 at CM/ECF p. 1).

unconscionability such that the arbitration clause can be deemed unenforceable under Nebraska law.

## II. Arbitration as to GPS.

GPS, a non-signatory of the Consulting Agreement and the Tax Consulting Agreement seeks to compel arbitration of Wolfe Electric's claims against it. In PRM Energy Systems, Inc. v. Primenergy, LLC, 592 F.3d 830 (8th Cir. 2008) the Eighth Circuit held that a non-signatory to a contract containing an arbitration agreement could require a signatory to arbitrate under certain limited circumstances. Id. at 834. Those circumstances include: (1) when the relationship of the nonsignatory with a signatory is so close that failing to order arbitration would "eviscerate the arbitration agreement; and (2) where the claims against the non-signatory are "so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely upon the agreement" for the basis of its claims but disallow arbitration of disputes arising under the same agreement. Id. at 834-35 (discussing CD Partners, LLC v. Grizzle, 424 F.3d 795, 798 (8th Cir. 2005). The court referred to the second circumstance as "alternative estoppel." PRM Energy Systems, 592 F.3d at 835.

In addressing alternative estoppel, the PRM court considered whether the party seeking to avoid arbitration was alleging "concerted misconduct" between a signatory of the agreement containing an arbitration provision and a non-signatory. To find sufficient "concerted misconduct," the court evaluates whether the plaintiff " 'specifically allege[s] coordinated behavior between a signatory and a non-signatory.' " Id. at 835 (quoting Donaldson Co., Inc. v. Burroughs Diesel, Inc., 581 F.3d 726, 734 (8th Cir. 2009)). The test for alternative estoppel requires allegations of "pre-arranged collusive behavior" that

demonstrates a connection "between [the parties'], wrongs, and issues necessary to compel arbitration." Id. at 835-36 (internal citations omitted).

In this case, there is little question the requirements for alternative estoppel allowing GPS to compel arbitration are present. Plaintiff makes little effort to distinguish its claims against the separate defendants. Its general allegations against all "Defendants" are pervasive throughout the Amended Complaint. See, e.g., Filing No. 32, ¶¶ 38-61. Specific examples of the GPS's alleged close relationship with the other two defendants and GPS's role in the alleged malfeasance include:

- On or about March 1, 2011, representatives for Defendants contacted Richard Wolfe, President of Wolfe Electric, by telephone at Wolfe Electric's business office located in Lincoln, Nebraska, and requested to meet with him. (Filing No. 32, ¶ 5, at CM/ECF p. 2).

- On or about March 1, 2011, Kathy Nielson, Major Account Executive for GPS, met with Mr. Wolfe at Wolfe Electric's office located in Lincoln, Nebraska. During the course of said meeting, Ms. Nielson represented to Mr. Wolfe that she was there on behalf of and with the consent of Defendants GPS and CBS. Further, Ms. Nielson represented that Defendant CBS would provide a business analysis service to Wolfe Electric in exchange for payment in the amount of One Thousand Three Hundred Dollars ($1,300). (Filing No. 32, ¶6, at CM/ECF p. 2).

- During the meeting between Mr. Wolfe and Ms. Nielson on or about March 1, 2011, Ms. Nielson represented to Mr. Wolfe that CBS and its related companies, GPS and STA, would provide specific results to Wolfe Electric, including a guaranteed 3-5% increase in profit margins plus increased profits during the first year sufficient to cover the cost of consulting services provided by CBS and its related companies. (Filing No. 32, ¶7, at CM/ECF p. 2).

- Also on or about March 14, 2011, a Senior Tax Consultant for STA, Tracy Legel, appeared at Wolfe Electric's office located in Lincoln, Nebraska, and represented that STA would provide tax-related services to Wolfe Electric

11

in conjunction with the services provided by CBS and GPS. (Filing No. 32, ¶18, at CM/ECF p. 4).

Plaintiff's allegations of malfeasance against GPS are indistinguishable from its accusations against CBS and STA. The allegations arise out of the same set of operative facts and are interdependent. Accordingly, GPS may compel arbitration of the claims Wolfe Electric has asserted against it.

### III.  Plaintiff's Request for Limited Discovery.

Plaintiff requests that if the court orders this matter to arbitration, Plaintiff should be allowed to conduct limited discovery, arguing that Defendants have "exclusive control over additional evidence that would support Wolfe Electric's claims" of fraud. Filing No. 20, at CM/ECF p. 16.  "The purpose of the FAA is 'to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible.' " Koch v. Compucredit Corp., 543 F.3d 460, 463 (8th Cir.2008) (quoting Moses H. Cone, 460 U.S. at 22, 103 S.Ct. at 940). Thus, pre-arbitration discovery is only allowed in the limited cases in which a party seeks additional information on the "making of the arbitration agreement or the failure, neglect, or refusal to perform" the agreement to arbitrate. Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 726 (9th Cir. 1999)(quoting 9 U.S.C. § 4).

In this case, Plaintiff has not provided any specific examples of what types of information Defendants may have in their possession that would provide additional insight into Plaintiff's fraud or unconscionability arguments. These arguments are almost wholly based on representations the Defendants allegedly made to Plaintiffs. As such, that information is currently in the possession of Plaintiff and, presumably, has been

submitted in opposition to Defendants' motion to compel arbitration. Accordingly, no discovery is warranted at this time.

IV.     Motion to Dismiss.

The Federal Arbitration Agreement generally calls for the stay of proceedings until the arbitration process is complete. 9 U.S.C. § 3. There is a judicially created exception to this rule whereby " 'district courts may, in their discretion, dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration.' " Roseman v. Sigillito, 877 F. Supp. 2d 763, 777 (E.D. Mo. 2012) (citing Green v. SuperShuttle Int'l, Inc., 653 F.3d 766, 769-70 (8th Cir. 2011)).

In this case, the plaintiff has raised questions about the enforcement of the arbitration provision and whether the claims should be subject to arbitration at all. Although the court finds little merit in these contentions, the arguments at least raise the remote possibility that some of the claims could be returned to the court by the arbitrator. Accordingly, this matter will be stayed pending resolution by the arbitrator.

IT IS ORDERED:

1)  Defendants' Motion to Compel Arbitration, (Filing No. 11), is granted and this case will be stayed pending the outcome of arbitration, which shall take place in Nebraska if the Plaintiff so desires.

2)  Defendants' motion is denied to the extent they seek dismissal of this case.

3)  Defendants' renewed Motion to Compel Arbitration, (Filing No. 33), is denied as moot.

4)  Plaintiff's request for limited discovery is denied.

5) The clerk of the court is directed to close this case for statistical purposes; and

6) The parties shall each file a status report, not less than once every six months, regarding the progress of their arbitration.

Dated this 8th day of May, 2013.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.